## VOLUME 53,

AND

# New York State Reporter,

## VOLUME 87.

(32 App. Div. 559.)

### MILLER v. BREWSTER et al.

(Supreme Court, Appellate Division, Fourth Department. July 26, 1898.)

1. NEGLIGENCE—INVITATION TO USE ELEVATOR—DUTY OF PERSON IN CONTROL.
   A seller was delivering goods to purchasers at a leased building, and by request of one of their employés he entered an elevator exclusively controlled by them, and ascended to one of the upper floors, to aid in delivering the goods, and took the same elevator to return. *Held,* that the seller was in the elevator by the purchasers' invitation, imposing on them the duty to use care while he was therein.

2. SAME—QUESTION FOR JURY.
   Evidence showed that plaintiff was in defendants' elevator, on their invitation, for the purpose of descending from an upper floor; and that when one of their employés on the outside pulled the elevator cord the elevator gave way, and dropped rapidly below, injuring plaintiff. *Held,* that the negligence of defendants was a question for the jury.

Appeal from trial term, Monroe county.

Action by Warren C. Miller against H. Austin Brewster and others for personal injuries. From a judgment in Monroe county in favor of the defendants, after a nonsuit, upon a motion made to dismiss the complaint on the grounds: First, that no negligence is shown on the part of the defendants; and, second, that, if negligence were shown, still the plaintiff had no right to recover, as he was a mere licensee upon the elevator, and the defendants owed him no active duty or care,—plaintiff appeals. The motion was made at the close of the plaintiff's evidence, and, when granted, the plaintiff took an exception. Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

53 N.Y.S.—1

Chas. J. Bissell and Wm. D. Ellwanger, for appellant.
Satterlee, Yoeman & Taylor, for respondents.

HARDIN, P. J. Plaintiff's complaint alleges that the defendants are co-partners doing business in North St. Paul street, in the city of Rochester (carrying on a general wholesale grocery business), and that on the 19th day of November, 1896, they kept and maintained in said building an elevator, running from the basement of said building to the seventh floor thereof, which was propelled by steam power, "and used by the defendants for the carrying of merchandise to and from the different floors of said building, and permitted to be used by the defendants for the purpose of conveying the employés of the defendants, and the different customers and persons having business with the defendants, to and from the different floors in said building." It is averred that on the 19th of November, 1896, the plaintiff, having theretofore sold to the defendants a load of beans, of about 45 bushels in quantity, went to the defendants' place of business and delivered the same, and while unloading and weighing the beans, and transferring them from the bags in which they were contained to bags belonging to the defendants, while the plaintiff was in the pursuit of such business of delivering said beans, and in order to facilitate the delivery thereof, "and at the request of the said defendants, the said plaintiff, in company with one of the defendants' employés, rode up in the said elevator to the seventh floor of said building, and there completed the delivery of the said beans." It is further averred that after such delivery was completed the plaintiff "got in the said elevator, for the purpose of descending therein; that said employé endeavored to start said elevator, which did not move, and thereupon the said employé got out of the elevator, leaving this plaintiff therein, and, immediately upon stepping outside, the said employé pulled on the rope of the said elevator; that immediately thereupon the elevator fell with great violence to the bottom of the elevator well, carrying the plaintiff with it, and causing him serious injury, hereinafter detailed."

The complaint contains several averments of negligent acts on the part of the defendants and their employés. It is further averred that:

"When said employé pulled upon the rope as hereinbefore detailed, he pulled the same in a negligent and unskillful manner, so that the belt used for raising and elevating said elevator as aforesaid was not properly transferred to the proper pulley, and that by reason of the aforesaid negligence of the defendants, and without any negligence upon the part of the plaintiff, the said elevator fell as aforesaid, and inflicted upon this plaintiff, as a consequence thereof, great and serious injury."

Plaintiff was called as a witness in his own behalf, and stated the circumstances attending his visiting the defendants' place of business and transferring the beans, which had a few days before been bought by the defendants. He says:

"When I got to the defendants' store I saw some of the employés, and told them that I had a load of beans my wife had sold to them, and they said that was all right. I then waited a little while. There was some work to be done before I could get unloaded. I took the beans from the wagon, and put

them on the truck, and they were taken into the store. They were all unloaded on two different trucks, and I helped push in the last load. They were weighed on the first floor, and then sent up on the elevator. I did not go with them, but sat around for a little while. Then I began to get a little uneasy as to whether I would get away before noon. I said to one of the employés, 'If you can get the beans unloaded so I can get away before noon, I will help you.' He said, 'All right.' Pretty quick he came down and said, 'You can help me now if you want to. One of the employés up there is called away.' Then I went up with him on the elevator. It was on the south side of the store, and I got in on the ground floor. The man that asked me to go up with him got in with me. I asked him, 'Where do you take these beans?' He said, 'Clear to the top.' We went to the top. I then went out where the beans were on the trucks, and we bagged the remainder of the beans. My beans were in bags, and they were taken out of my bags and put in other bags. The work took about ten or fifteen minutes. There was less than twenty bags. After I had completed that work my bags were put on the trucks, and run onto the elevator. They were two very wide trucks, and put side by side with my bags on them. This man then got onto the elevator, and got on first, and I followed him as closely as I could. The trucks and the bags were already on. I got on the east part of the elevator. * * * After I got on the elevator the man pulled the cord or cable to go down. At that time he was standing in front of me. It [the elevator] did not move, and he said: 'We are stuck. Power is shut down.' When he said that, he stepped out onto the floor, turned around, and reached in and gave a pull again. I was on the elevator. He turned and gave this pull right away. Then the elevator began to descend rapidly. Nobody was in the elevator but myself. It started on a moderate gait, and the further it went the faster it went. It went into the cellar. It struck heavy. The effect it produced on me was that I was all shook up."

In the course of his cross-examination he said that the same man who went up in the elevator with him started down with him, and he added:

"I did not have anything to do with running the trucks on the elevator, or throwing the bags on. The other man did that. Then we both got on the elevator, and he pulled a cord or cable to go down. I don't know whether he pulled it up or down. It didn't start. Then he said: 'We are stuck. The power is shut down.' The doors to the elevator shafts were still open. The elevator was right at the floor. It hadn't started any; just as it was when I got on. Then he stepped off. I don't remember whether he said, 'We will have to walk down,' when he got off. I didn't suppose anything about whether he was going to walk down. I didn't have time to think about it. He stepped off onto the floor, and after he stepped off he took hold of the cable again while he was standing on the floor. I had no warning to make an effort to get off after he got off, nor did I do so. After he got off, he turned around and pulled the cord again. He didn't say anything. I couldn't say which way he pulled the cord. He pulled it once, anyway."

The elevator was maintained and operated by the defendants for the benefit of themselves, their customers, and those having business with them. They had taken a lease of the building from Archer, the owner of the property, with power to run the elevator during business hours, under a stipulation in the lease that the lessor was to keep the said building and elevator in proper repair from actual wear and tear, "but if any repairs are made necessary by the careless or improper usage or other acts of the parties of the second part, or their employés, the same must be paid by said second parties."

The evidence discloses that the defendants had full possession,—full control,—and they and their employés the full management of the elevator, and its use in their business. The defendants permit-

ted the plaintiff to enter their premises on business, and they, or their employés, expressly requested him to use the elevator, and ascend to the upper floor and aid in emptying the bags of beans, and consummate a delivery of such property as he had sold to the defendants. In Beck v. Carter, 68 N. Y. 292, it was said, viz.:

"When the owner of land expressly, or by implication, invites a person to come upon his land, he cannot permit anything in the nature of a snare to exist thereon, which results in injury to the person who avails himself of the invitation, and who at the time is exercising ordinary care, without being answerable for the consequences. If, however, he gives but a bare license or permission to cross his premises, the licensee takes the risk of accidents in using the premises in the condition in which they are."

We think, under the doctrine laid down in that case, it may be said that the plaintiff was in the elevator by the invitation of the defendants, or their agents, and that they were bound to use care and caution towards him, to the end that he might safely pass up and safely return while engaged in the business of unloading the property which he had sold to the defendants. In Cosulich v. Oil Co., 122 N. Y. 126, 25 N. E. 260, it was said by Parker, J.:

"In actions founded on negligence, the onus of establishing it rests upon the plaintiff. In determining whether he has sustained this burden, it is necessary, in certain cases, to inquire whether an inference of the fact of negligence can be drawn from other facts proven. When it can be, then it is said that a presumption of the fact of negligence is permissible. And, of necessity, it embraces, not only the doing or omission to do the thing complained of, but also the relations of the parties; i. e. whether, in that which he did or omitted to do, he failed to discharge some duty owing to the plaintiff."

The learned judge then refers to Beck v. Carter, supra, and follows the doctrine there laid down.

When the plaintiff entered the elevator to descend, he had a right to assume that the defendants would operate the elevator with care and caution, so that his descent would be safe. In Tousey v. Roberts, 114 N. Y. 315, 21 N. E. 400, it was said:

"The defendant assumed to operate the elevator for the benefit of his tenants, and he was required to exercise due care for their safety, and was liable to his tenant for the negligence of his employés in operating the elevator."

It was further said in the course of the opinion delivered by the learned judge in that case, viz.:

"An elevator for the carriage of persons is not, like a railroad crossing at a highway, supposed to be a place of danger, to be approached with great caution; but, on the contrary, it may be assumed, when the door is thrown open by an attendant, to be a place which may be safely entered without stopping to look, listen, or make a special examination."

The doctrine of that case was adverted to and followed in Simmons v. Peters, 85 Hun, 93, 32 N. Y. Supp. 680; and the doctrine of that case in the second appeal was approved in the opinion delivered by this court, reported in 20 App. Div. 251, 46 N. Y. Supp. 800.

We think that the testimony disclosed facts and circumstances which presented a question as to the manner of the operation of the elevator, and that, as a question of fact, the jury ought to be allowed to determine whether it was operated with care, skill, and caution; and therefore the case was improperly taken from the jury.

Nothing appears in the case to indicate any contributory negligence on the part of the plaintiff. Whether the defendants' employé, in the management of the elevator, was guilty of negligence, was a question of fact, which should have been submitted to the jury. The evidence of one of the belts being loose, and that subsequent to the accident the same was tightened, was received, and may, to some extent, have borne upon the question of whether the employé was negligent in the management of the elevator at the time the plaintiff received the injuries complained of. It was said in the course of the evidence that the elevator was balanced so that in the absence of the power it would remain stationary. The fact, however, was shown that the weight of the man and the weight of the bags were in the elevator, and actually caused the same to descend with great rapidity from the seventh floor to the cellar, and that the rapidity of the motion· was such that the plaintiff received the jar or bruises of which he complains. We think a question of fact was presented, which ought to have been submitted to the jury.

·Judgment reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur except ADAMS, J., not voting.